Good morning, Your Honors. May it please the Court, my name is Rory Miller. I represent the Appellant Packsys, and I'd like to reserve five minutes for rebuttal with the Court's indulgence. The present appeal involves one factual question from which three different legal issues flow, and that is the issue of the former General Director of ESSA, the Appellee's Enter into the Contract in this case. The legal issues that flow from that are, one, what standard is necessary for this Court to apply to such a contract when determining whether it binds a sovereign state-owned entity, such as ESSA, two, how a district court presented with a factual discussion like that is to allocate the burdens in sovereign immunity cases, and three, when the district court is presented with disputed facts, what is the course of action that it must take? Any one of those three issues would be sufficient to warrant reversal in this matter. On the first one, on the authority of an individual actor, the case turns on whether this Court's decision in Thanuth v. Republic of Indonesia stands for the proposition, as ESSA contends, that regardless of the character of the act, whether it's a sovereign act or a commercial act, only actual authority is sufficient to bind. Oh, isn't that what the case stood for? Because I'm looking at it. It says, we hold that an agent must have acted with actual authority in order to invoke the commercial activity exception against a foreign state, and there's nothing in there that makes this distinction you're making. That's correct, Your Honor, and there are two reasons, we believe, for that. First, the issue in that case dealt with a truly sovereign actor. It was the Indonesian National Defense Council, the army, essentially. And second, one of the key elements of that case noted that this Court, the Ninth Circuit, had never required a defendant seeking to prove at the outset that it was involved in a sovereign public act. Later, this Court, in Terankian v. The Republic of Iraq, stepped back from that and said that at the outset of an FSIA case such as this, the defendant needs to assert that it is an instrumentality of a foreign state and that its act was a sovereign public act. As a result, while Fanouf does say that directly, it doesn't apply to this specific instance, nor is it consistent with the direction the Court has taken and, in fact, what the Congress intended when it enacted the FSIA and the last 70 years or so of State Department policy implementing the restrictive theory of sovereign immunity, which draws a hard distinction between sovereign public acts and private commercial acts, such as a contract for the sale of residual brine, which is what we have here. In our view, once the sovereign removes his crown and steps among the common people to engage in commerce, then all of the standard laws and regulations apply. Common law agency principles, common law contract formation and binding principles, and that's exactly what the sovereign immunity doctrines for commercial activities and waiver and so forth state, that when a state such as Mexico or its instrumentalities, such as the 51 percent on state entity here, deem to engage in commerce like any other citizen or entity, they are treated by the law like any other citizen or entity and are not accorded immunity from our courts. Let me ask this question. As you know, the district court dismissed or granted the motion to dismiss because there was no Foreign Sovereign Immunities Act exception that applied. What exceptions do you think actually apply on this record? On this record, we believe two separate exceptions apply. The first that I've hinted at is the commercial activity exception. But the second, which is a simpler issue, is there's a waiver, Your Honor. If this contract is binding, at least at the outset and subject to dispute later possibly, but assuming that this contract is valid, given that it contains a choice of law provision, at the very least, stating Is that really a choice of law provision? I believe it is, Your Honor. Doesn't it just say where a suit will be filed? It doesn't really say which law would govern. Your Honor, I actually believe that the arguments are the opposite, that ESSA is contending that it doesn't confer jurisdiction and simply says where the law shall apply. Because the contract, I believe, says that it shall be the federal laws applicable in Los Angeles. And I'm doing that from memory, so I might have misstated it slightly. But under this Court's precedent, a choice of law provision where a foreign state, whether in a sovereign act or in a commercial act, consents to be bound by state or federal law of this country, that's considered an implicit waiver of sovereign immunity. So that's one of the two exceptions. And on that issue of what exactly this contract calls for, Your Honor, that brings us to one of the other points that I raised at the beginning. Namely, what is a district court to do when presented with a contract that is contended, means one thing by the plaintiff, one thing by the defendant? The answer to that question is twofold. One, this Court has adopted a burden-shifting framework for such issues. Which the district court applied, didn't it? Which the district court purports to apply in its order, Your Honor. We believe that a actual review of the order demonstrates that it failed to properly apply the burden-shifting. Because a portion of the burden-shifting allocates who is required to come forth with evidence to support its positions, as well as how to, on the third issue, deal with conflicting evidence. The answer to that question, Your Honor, is if evidence is in conflict, the district court has two options. It may either permit jurisdictional discovery to allow a record to be made on which facts may be determined. Did you request jurisdictional discovery? Yes, Your Honor, and it was denied. Or the court may deny jurisdictional discovery, but it is required by precedent and the procedural posture of the case to construe all disputed facts in favor of the non-moving party. So, as a result, the district court is fully within its prerogatives to deny jurisdictional discovery, either because it believes that that would be burdensome or otherwise unnecessary. But if it does, it must construe any dispute in favor of the non-moving party. Here it did not. For example, on this very issue of the choice of law provision, it did not resolve that issue. Similarly, in the record, if Your Honors will recall, there was testimony by declaration to the district court from Mr. Portillo, the general director of ESSA himself, that he was in fact authorized by the board of ESSA's directors. Similarly, he provided testimony and information regarding his understanding of the contract. And as Your Honors know, contract interpretation, when it's ambiguous, is open to parole evidence. You know, Portillo's declaration never actually comes out and says that the board approved or ratified the contract with PACIAS. When I read it, I thought, well, if the board, in fact, did approve or ratify, wouldn't he have said that in his declaration? I believe, Your Honor, that yes, there is not an outright explicit statement. But Mr. Portillo did outline the course of events, and he specifically pointed to the infamous in this dispute, Resolution 51, and what that meant. Now, ESSA has provided a different interpretation of Resolution 51, whether that constituted an approval or ratification or not. The dispute there has to do with whether it involves Mr. Portillo being authorized to pursue a contract or to consummate a contract. Again. Let me ask this question. I read in the materials here that it quoted as undisputed that the board never passed a resolution expressly approving the contract with PACIAS. Is that accurate, what I just said? I believe it is not, Your Honor. It's true that within the record, because of the order of proof and the fact that much of the information on which ESSA relies was submitted on reply to which the district court denied any opportunity to respond, there is no further response. However, there is, once again, the dispute regarding Resolution 51 and its import, which notably was not submitted in full, was not the subject of any specific inquisitional testimony, such as through a deposition or court testimony, and otherwise was not subject to challenge. That given . . . I was just looking at your time. You said you wanted to reserve five minutes. Oh, I'm sorry. I apologize, Your Honor. I've eaten into my rebuttal time, but I hope that at least I've managed to answer your question. And with that, unless the Court has any further . . . I just have one other question. I'm sure Judge Reiner will give you extra time if you need it. What would you have put in if the district court let you put in additional evidence after the reply was filed? What would you have put in? That's a very good question, Your Honor. And in the form of an appellate offer of proof, we have had numerous discussions with Mr. Portillo, who is a resident, at least part-time, here in the Southern California area. Mr. Portillo described the actual process and what was presented during Resolution 51, which included that he had a slideshow, distributed packets of the Paxos contract to the Board, and the slideshow highlighted some of the financial terms, and otherwise obtained its appropriate resolves. Furthermore, Your Honors, in Mexico, unlike in the United States, many, many of these Freedom of Information Act equivalence requests, we have some of those recordings now. Those would have been submitted as well and would shed light on what, in fact, transpired at the meetings which are in dispute. Had the district court allowed us to proceed with jurisdictional discovery, those would have been placed into evidence, and the district court could have ruled based on those. Since it did not, it must construe any disputed fact or any divergence of views between our With that, I have three minutes, and I think that may be sufficient for rebuttal, so at this time, I will not beg the Court's indulgence. If you need another two, we'll give it to you. Thank you, Your Honors. Good morning, Your Honors. Stephen Olson for Defendant Apolli Exportadora de Sal, which I'll refer to here as ESSA. ESSA is a foreign state under the Foreign Sovereign Immunities Act because Mexico owns a majority state. Therefore, its acts are presumptively immune. They're presumptively immune unless plaintiffs can show that an exception applies. Here they are attempting to show that there's a commercial activity exception, but it's important to note that before you get to that, that presumption applies. FISA does not require ESSA to prove a public act or to establish a prima facie case of  FNUF could not be more clear on that, neither could the statute. And here we know that Portillo can only act to waive sovereign immunity if he had actual authority to bind ESSA to a contract. The Court's precedent in FNUF could not be more clear. Why does an actual authority exist here based on this record? Actual authority does not exist here because to have actual authority, he would have had to have a resolution from the Board. The law in Mexico is clear and the Court properly applied that law and properly found that there was no resolution. The Court found, for example, that Resolution 51 did not equate to an authorization because it did not set a price for the sale of goods, and the Court was not clearly erroneous in that finding. Well, he argues that there was ratification, or no, there was authorization to Resolution 51. Why doesn't Resolution 51 authorize him to take all actions to deal with the Sebring problem? Because Your Honor, what it did is set forth a scheme or a formula to determine the price of a contract and to, you know, look into possible buyers. So it basically set forth a process. What it did not do is what is expressly required under Mexican law. It did not authorize a contract setting a price for the sale of goods. And Article 58... Contract has to... So it has... The resolution is required under Mexican law to actually authorize the exact price, not a formula? Correct. And the reason why this is so important is this is a fundamental tenet of Mexican law, Mexican anti-corruption law. Mexican anti-corruption law set forth in the Constitution and embodied in Article 58, which the District Court applied here, makes it very clear that it's set out to prevent exactly what happened here. It's set out to prevent one person being able to go out on their own and set a price for the sale of goods. And that's what happened here, you know, through meetings and restaurants. This is exactly what Article 58 is designed to prevent. So that's why it's so... This case is so important to Mexico and has such a strong interest in this case. Just responding to some of the things that counsel said. First of all, it's not just FANUF, of course, but there is very clear authority on actual authority. Recently, this Court applied that standard again in EduMAS. The point about this commercial activity exception that is being argued here that somehow, because it's a commercial act, it's really putting the cart before the horse. The Court is saying, excuse me, not commercial activity, but waiver. Counsel said that it was waived through a purported choice-of-law clause in the contract. But to take that and conclude waiver would really be putting the cart before the horse. Is a waiver only if there's a contract? Excuse me, Your Honor? Is a waiver only if there's a contract? Correct, Your Honor. There's a waiver only if there's a contract, and there's no contract here. So for him to assume that there's a contract and apply what is, as Judge Warlaw pointed out, not even clearly, a choice-of-law provision would be backwards. We have to first look to see whether this is a valid contract, Your Honor, is correct. With respect to the evidence below, I think one very important point is that the plaintiffs had access to Mr. Portillo the entire time. They alone submitted a declaration from Mr. Portillo. And in that, as the Court has questioned on, in that declaration, nowhere does he say he had actual authority. Nowhere does he say he obtained a board resolution authorizing the sale of Mexico's goods. And as the District Court said, it's artfully phrased. And even now, it's not clear what additional evidence they claim would be helpful to resolve this very clear question. So what is your theory about what Portillo was doing if he didn't have actual authority to enter into this contract? All the meetings and dinners and conversations about the contract and disposition of the sea brine. My theory is that this was a corrupt act, Your Honor, that Mr. Portillo was acting towards the end of his tenure selling Mexico's goods in an impossible-to-comply contract. It's important to note here, this is a 40, purportedly a 40-year contract for the sale of 10 million tons of brine a year. And they say it's worth billions of dollars. And to have that kind of a contract in clear violation of Mexico law without a board resolution is incredible. It's kind of a mystery, Tim, you know, you come in on these legal issues. Are there domestic Mexican political issues that we're not aware of that are surrounding this? Well, there was a change in the CEO position from Mr. Portillo. Was that a change because a new president was elected or is the president a Mexican? It was the same administration, I believe, but perhaps different political affiliations. I think, though, it's important to note in terms of what's happening in Mexico, and this with respect to this contract on corruption charges, also with respect to what's going on in Mexico, I'd ask this Court to note that there is a case that Paxos filed in Mexico to attempt to annul this very contract, and that's proceeding. Did Paxos file? I'm sorry, did I say Paxos? Yes. Paxos filed. Okay. Thank you. Unless your Honors have any further questions, I will conclude. Let's see if I can stay within my original welcome, Your Honors, very briefly. Thank you. The issue that counsel began with, that ESA is presumptively immune, is not in dispute. That is what the Foreign Sovereign Immunities Act says. And then he points to FANUF, which says that there's a presumptively immune status unless some exception applies. But he ignores the decisions of this Court after FANUF, such as Tarantino, which was in 2012. I believe FANUF was 1997, which specifically states that under the burden-shifting framework of the FSIA, the defendants must establish a prima facie case that, and it's quoting an earlier decision, Cederman v. Blank, that it is a sovereign state, and that plaintiff's claim arises out of a public act. FANUF doesn't grapple with that distinction, nor does the memorandum opinion in edumos that was referenced briefly by counsel and was the subject of Rule 28J letters that the Court can review. Finally, there are two other issues. We focused a lot on what Mr. Portillo says and does not say in his declaration. And it's important to see what he does and does not say. There's been a lot of effort to parse his language and determine whether it was artful or simply stating facts as necessary. But I would point the Court also to the fact that Mexican legal experts' declarations were also submitted to the District Court, explaining the import of Mr. Portillo's declaration and the acts that he sets forth as having taken place in there. That's tab 15 of our record, Your Honor, which is our declaration. And there is also rebuttal declarations from the other side, which I conveniently forgot to look up the numbers to, and I apologize. Finally, there was this mention of the corruption arrest of Mr. Portillo, as well as subsequent legal actions in Mexico. I think that it's important to note that each and every one of those acts took place subsequent to the filing of this lawsuit. ESSA waited to file its annulity action in Mexico until after the District Court ruled. Mr. Portillo was arrested after he assisted Paxos in this case. And in fact, if Your Honors refer to Mr. Portillo's and the CEO of Paxos's declarations, which are in the record, the CEO is Jose Abuin. Both of those discuss extralegal efforts by the Mexican government to pressure noncompliance with this suit. If anything, based on the record, including the information that counsel pointed to, that further demonstrates that factor, which is relevant to, and I apologize, my time's up. Two seconds, please. Which is relevant to, among other things, the form non-analysis, which we didn't really discuss this afternoon, or morning. I apologize. Thank you, Your Honors. Thank you, counsel. Thank you, counsel. The case just argued will be submitted. Thank you all very much for the arguments.
judges: Reinhardt, Wardlaw, Daniel